

BRYAN CAVE LEIGHTON PAISNER LLP
One Metropolitan Square
211 North Broadway Suite 3600
St Louis MO 63102
T: +1 314 259 2000
F: +1 314 259 2020
bclplaw.com

Charles B. Jellinek
Partner
Direct: 314/259-2138
Fax: 314/552-8138
cbjellinek@bclplaw.com

October 22, 2020

Darrell Graham
District Director
Equal Employment Opportunity Commission
100 Alabama Street, S.W.
Suite 4R30
Atlanta, GA 30303

**Re: Deron Alleyne v. First Data/Fiserv**
**Charge No. 846-2020-10796**

Dear Mr. Graham:

Respondent Fiserv, Inc. ("Fiserv")[1/] submits herein its position statement in response to the Charge of Discrimination ("Charge") filed by Deron Alleyne ("Alleyne").[2/] In the Charge, Alleyne alleges Fiserv failed to accommodate his religion and terminated his employment because of his religious beliefs. Fiserv denies that it engaged in any unlawful discrimination, retaliation or other violation of law.

---

1/ Alleyne was employed by First Data Merchant Services, a wholly owned subsidiary of First Data Corporation. First Data Corporation was acquired by Fiserv, Inc. in July 2019. Fiserv, First Data Merchant Services and First Data Corporation are collectively referred to as "Company."

2/ This Position Statement is submitted solely for informational purposes to aid in the Commission's investigation and in an effort to resolve the Charge. By submitting this Position Statement, Fiserv does not waive its right to present new or additional facts or arguments based upon subsequently-acquired information. Further, this information, while believed to be true and correct in all respects, does not constitute an affidavit and is not intended to be used as evidence of any kind in any agency or court proceeding. Additionally, this Position Statement shall not preclude or limit Fiserv from asserting any additional legal defense or theory in opposition to the allegations in the Charge, or in subsequent litigation, if any.




## I. BACKGROUND

### A. Company Information

Fiserv and its respective divisions is a leading provider of technology solutions for the financial industry. Among its many products and services, the Company provides electronic commerce and payment systems for its financial services clients, which include banks, credit unions, credit card companies, mortgage lenders and leasing companies, telecommunications companies, brokerage firms, merchants and other financial sector businesses. Fiserv strongly prohibits discrimination in all phases of the employment process and is committed to a workplace of diversity and inclusion. A copy of Fiserv's policy prohibiting discrimination is set out in the Company's Code of Conduct, which is provided to all associates of the Company, and all associates are trained regarding the Code of Conduct. **Exhibit A – Fiserv Code of Conduct, pp. 9, 27.**

### B. Alleyne's Position

Alleyne was hired by First Data on September 18, 2017, in the Marietta, Georgia call center location. At the time of his termination, Alleyne was employed by Fiserv as a full-time Telesales Representative and was part of a small team of eight consultants. In his position, Alleyne was responsible for answering inbound sales calls for Fiserv's Merchant Services division. Alleyne was supervised by Sheri Tynes ("Tynes"), Sales Director.

### C. Alleyne's Termination

On or about October 10, 2019, Alleyne was working a half-day, having elected to use four hours of comp-time that afternoon. When Tynes arrived for work that morning, Alleyne was already at his desk, talking to several co-workers. As Tynes approached her own desk, she could tell Alleyne appeared agitated about something. He immediately stated to Tynes that it was a religious holiday in his faith and he shouldn't be at work. Tynes asked him what he meant. Alleyne responded that he wanted to know about religious holidays because the Company "let the Muslims pray three times a day," and he wanted to know his "religious rights." Tynes asked Alleyne what he needed and he stated that he wanted to know which religious holidays he could take off work. Tynes told Alleyne that he could utilize the paid time off allotment he received at the beginning of each year however he wanted for religious holidays he wished to take off throughout the year. Alleyne raised his voice, telling Tynes she didn't seem to know for sure, so he needed the exact policy.

Tynes told Alleyne she would talk to her supervisor, Larry Brown ("Brown"), Vice President of Sales. When Tynes located Brown, he was in his supervisor's office, Leslie Pearce ("Pearce"), Senior Vice President of Inside Sales. Tynes explained to Brown and Pearce that Alleyne had a question about religious accommodation, but that he did not trust that her response had been correct. Brown told Tynes he would talk to Alleyne and asked her to bring him to the office.




Tynes approached Alleyne and escorted him to where Brown was. When he arrived in the office, Brown asked Alleyne what he needed. Alleyne again stated that his particular religion was observing a holiday that day and he wanted to know what his rights were. Brown and Pearce told Alleyne that Fiserv frequently made religious accommodations and would do so for Alleyne as well. Brown and Pearce asked Alleyne what sort of accommodation he needed, suggesting a number of options, including time away from his desk for prayer, a private room, extra time during the lunch hour or use of the wellness room—all accommodations the inside sales team was currently making for other employees, or had made in the past upon request. Brown and Pearce also reiterated what Tynes had told Alleyne about using his allotted paid time off for whatever religious holidays he chose throughout the year. Alleyne indicated he did not want to work on religious holidays and thought he should not have to use his paid time off for such holidays, but instead should just be given the day off with pay. Accordingly, Alleyne was also told he could volunteer to work on one of the designated Company holidays and gain a "banked day" for future use on one of the holidays he observed. Alleyne said he would definitely do that in the future. Before Alleyne left the office to return to his desk, Brown and Pearce again told him to let them know what he needed and they would work with him to find an accommodation. Alleyne said he was "okay" with the policy and that he just wanted to know the specifics of the Company's policy.

Alleyne appeared to accept Brown and Pearce's explanation and returned to his desk, which was two seats away from where Tynes sat. About an hour later, Alleyne scooted his chair toward Tynes, bumping into her chair. He leaned toward her and said, "You set me up." Tynes leaned away from Alleyne and asked him what he meant. Alleyne responded, "The next time you take me in to see Larry and Leslie, I'm kicking your ass." Tynes was understandably shocked and asked Alleyne, "What did you just say?" Alleyne repeated his statement, saying, "You heard me. The next time you take me into Leslie and Larry's office, I am going to kick your ass." Alleyne then turned to another co-worker, Monique Chong, and asked her if she heard what he had said. She responded, "Yes, you said the next time Sheri takes you into Leslie's office, you are going to kick her ass." Tynes, still taken aback, responded to Alleyne by telling him, "You don't get to say that to me. It's disrespectful, insubordinate, and you can't say that to me." Shortly after, Alleyne and Tynes both left work for the day.

The following morning, Tynes approached Brown and spoke to him about what Alleyne had said to her the previous day. Tynes told Brown she was uncomfortable with Alleyne after he had threatened her and she asked Brown to address the issue. Brown met with Alleyne to discuss the incident. At no time during the conversation did Alleyne deny telling his supervisor that he would "kick her ass." In fact, Alleyne admitted that he had made the threatening statement to Tynes. He told Brown that he knew it was wrong and he shouldn't have said it. Brown told Alleyne that what he had said was a terminable offense and it "was not good." After their conversation, Brown contacted Human Resources and Alleyne was suspended with pay pending a decision on the appropriate disciplinary action. Alleyne was terminated for this conduct on October 18, 2019.




## II. CHARGE ALLEGATIONS

1. I began my employment with the above-named employer on October 18, 2017, as a Business Consultant.

**Response: In response to this allegation, Fiserv states that, according to its records, Alleyne was hired by First Data Merchant Services on September 18, 2017, as a Telesales Representative, fielding incoming sales calls from Fiserv's merchant customers.**

2. On October 14, 2019, I inquired about the policy regarding religious accommodation.

**Response: Fiserv denies this allegation. Responding further, Fiserv states that, according to its records, Alleyne raised a question about religious holidays on October 10, 2019. Fiserv denies any allegations that are inconsistent with this response.**

3. On October 18, 2019, I was discharged.

**Response: Fiserv states that Alleyne was terminated on October 18, 2019, for misconduct that occurred on October 10, 2019. Alleyne violated Fiserv's Code of Conduct when he directed a threat of physical violence toward his supervisor. Fiserv denies any allegations that are inconsistent with this response. Responding further, Fiserv specifically denies any insinuation that Alleyne's termination was related in any way to his inquiry about religious holidays.**

## III. DISCUSSION

### A. There is no merit to Alleyne's failure to accommodate claim.

As an initial matter, it is unclear whether Alleyne is asserting a failure to accommodate claim under Title VII, or whether his Charge mentions the accommodation question only as evidence for his discrimination claim. To the extent Alleyne claims he requested a religious accommodation that Fiserv refused to grant, such claim has no merit. In religious accommodation cases, a burden-shifting framework applies, like that in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1293 (11th Cir. 2012). Under this framework, Alleyne must first establish a *prima facie* claim by presenting evidence sufficient to prove that (1) he held a sincere, bona fide religious belief that conflicted with an employment requirement; (2) he informed Fiserv of the belief and conflict; and (3) he was discharged for failing to comply with the conflicting employment requirement. *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 505 F.3d 1317, 1321 (11th Cir. 2007). Once the employee establishes a *prima facie* case, the burden shifts to the employer to show (1) that it offered a reasonable accommodation of the employee's religious practices, or (2) that any accommodation would result in undue hardship. *Camara v. Epps Air Serv., Inc.*, 292 F. Supp. 3d 1314, 1326 (N.D. Ga. 2017).




i. **Alleyne cannot establish a *prima facie* case**

Beyond asserting in the Charge that his religion is "Hebrew, Israelite," Alleyne has not provided any information regarding the bona fide religious belief that conflicted with the employment requirement. While Alleyne did assert to Tynes on October 10, 2019, that it was a religious holiday, he did not provide any context for what that meant with respect to his employment. He did not claim that work was prohibited on that particular day. Brown and Pearce attempted to clarify this information during their conversation on October 10, when they asked Alleyne what exactly needed to be accommodated. Did he need a longer lunch break to attend a worship service? Did he need access to a private room for prayer or meditation? To date, Alleyne still has not provided any evidence demonstrating a religious belief that conflicted with an employment requirement, or that he made a specific request for religious accommodation.

Even assuming Alleyne had sufficiently articulated to Fiserv that he held a bona fide religious belief and it conflicted with, for example, his presence at work that morning, he still cannot show the third prong of a *prima facie* case—that he was discharged for failing to comply with the employment requirement. Alleyne was at work on that particular religious holiday and, in fact, had previously elected to use comp-time for taking that afternoon off. Whatever conflict existed between his religion and employment, Alleyne was not discharged for failing to meet the employment requirement.

ii. **Fiserv offered Alleyne an accommodation**

Even if Alleyne could establish a *prima facie* case, which he cannot, Alleyne was offered several potential accommodations. A reasonable accommodation is one that "eliminates the conflict between employment requirements and religious practices." *Id.* at 1322. Fiserv was not required to offer a choice of several accommodations; it was required only to show that "the employee was offered a reasonable accommodation, 'regardless of whether that accommodation is one which the employee suggested.'" *Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1293 (11th Cir. 2012). Construing his inquiry on October 10 broadly, and assuming it constituted a request for accommodation, it appears Alleyne did not want to be at work on October 10 and did not want to work on future religious holidays.

In response to his questions, Alleyne was informed by Tynes, Brown and Pearce that he was free to request time off for any religious holiday. The request, however, needed to be made in advance. Presumably, Alleyne was aware of that requirement, as he had already scheduled time off for that very afternoon. Alleyne was also told that he had the option to work on Fiserv holidays in exchange for a day off he could use on his religious holidays. Both of these avenues would accommodate Alleyne's religious beliefs.[3] It is well-established that "any reasonable accommodation by the employer is sufficient to meet its accommodation obligation." *Id.* at 1294 (*quoting Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986)). Even unpaid leave for

[3] Notably, neither of these two avenues were new to Alleyne and had been available for any prior holidays he had celebrated. It is unclear why his first question about religious accommodation arose on the day of the holiday, two years into Alleyne's employment.




religious observances has been held to be a reasonable accommodation. 479 U.S. at 71 (1986) ("The provision of unpaid leave eliminates the conflict between employment requirements and religious practices by allowing the individual to observe fully religious holy days and requires him only to give up compensation for a day that he did not in fact work."); *Pinsker v. Joint Dist. No. 28J of Adams & Arapahoe Counties*, 735 F.2d 388, 391 (10th Cir. 1984) ("Defendant's [leave] policy, although it may require teachers to take occasional unpaid leave, is not an unreasonable accommodation of teachers' religious practices."). Ultimately, Alleyne opted not to utilize the options available to him and, therefore, cannot now claim Fiserv failed to accommodate his religious beliefs, whatever they may have been.

**B. Alleyne was not terminated for requesting an accommodation**

**i. *Prima facie* case for retaliation**

Alleyne's second allegation, while alleging religious discrimination, essentially amounts to a retaliation claim. Alleyne alleges that he inquired about religious accommodation and, shortly thereafter, he was discharged. To make a *prima facie* case of retaliation, "the plaintiff must show: (1) he engaged in statutorily protected conduct; (2) he suffered adverse employment action; and (3) that there is 'some causal relation' between the two events." *Jean-Pierre v. Naples Cmty. Hosp., Inc.*, 817 F. App'x 822, 829 (11th Cir. 2020), *citing Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010) (citation omitted). If the employee can establish a *prima facie* case, the employer has the opportunity to articulate a legitimate, non-retaliatory reason for the employee's termination. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). In response to Fiserv's legitimate, non-retaliatory reason for terminating his employment, Alleyne then bears the burden of proving by a preponderance of the evidence that Fiserv's reasons were pretextual. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

**ii. *Prima facie* case for discrimination**

Whether an employer intentionally discriminated against an employee is a question that may be proved either through direct or circumstantial evidence. *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012). Direct evidence of discrimination is "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee" and "that, if believed, proves the existence of a fact in issue without inference or presumption." *Id*. Alleyne has not provided any direct evidence of discrimination, and, instead, the McDonnell Douglas burden-shifting framework will apply to his claim. To establish a *prima facie* case of discriminatory termination under the McDonnell Douglas burden-shifting framework, Alleyne must show that (1) he is a member of a protected class; (2) he was qualified for his job; (3) he was terminated; and (4) similarly-situated employees outside his class were treated more favorably. *MackMuhammad v. Cagle's Inc.*, 379 Fed.Appx. 801, 804 (11th Cir. 2010) (per curiam). If the employee establishes a *prima facie* case, the employer need only produce evidence that there is a legitimate, non-discriminatory




reason for the challenged employment action. *Kelliher v. Veneman*, 313 F.3d 1270, 1275 (11th Cir. 2002).

**iii. Alleyne was terminated for a legitimate, non-discriminatory, non-retaliatory reason.**

Alleyne cannot prevail on his claim regardless of whether it is interpreted as a retaliation or discrimination claim. Even if he had established a *prima facie* case under either theory, Alleyne's religion and his alleged "accommodation request" were not the reason for his termination. Rather, it was his physically threatening and aggressive conduct toward his supervisor that resulted in his termination. Alleyne told his supervisor that he would "kick her ass." His threat was witnessed by a coworker and when confronted by the VP of Sales, he did not deny the conduct. Rather, Alleyne admitted he shouldn't have threatened Tynes. It was this conduct, in clear violation of Fiserv's workplace requirements, that resulted in Alleyne's termination.

The Code of Conduct and Business Ethics ("Code of Conduct") forms the core of Fiserv's culture. Employees receive training on this policy and are aware that Fiserv regards the behaviors contained therein as a requirement for employment. One of the principles included in the Code of Conduct is a "Respectful Environment." Exhibit A, p. 25. Specifically, the Code of Conduct provides that "respectful behavior is not optional—it is an expectation of all associates." It is indisputable that threatening another employee is disrespectful, but to avoid confusion, the Code of Conduct includes examples of respectful behavior such as: "Treating people professionally and respectfully," and "Being aware of …the potential impact of your actions." Unacceptable behavior includes, "Using derogatory or inflammatory language." The Code of Conduct also includes principles of Workplace Safety and Security, which states "Fiserv will not tolerate acts of violence, including verbal or physical threats…" The Workplace Safety and Security principles also requires all Fiserv associates to "act in a manner that promotes a safe and respectful workplace" and prohibits associates from "engag[ing] in incidents or threats of workplace violence or intimidation. . ." Exhibit A, pp. 30-31. As a result of his threatening conduct, in clear violation of Fiserv's workplace rules and expectations, Alleyne was terminated.

## IV. CONCLUSION

In light of the foregoing, Respondent Fiserv, Inc. respectfully requests that the Charge be dismissed in its entirety.

Very truly yours,

*/s/ Charles B. Jellinek*

**Charles B. Jellinek**

CBJ